1 | ROBERT W. DICKERSON (SBN 089367)
  | rdickerson@zuberlaw.com
2 | ARMAND F. AYAZI (SBN 162893)
3 | aayazi@zuberlaw.com
  | MEREDITH A. SMITH (SBN 281120)
4 | msmith@zuberlaw.com
5 | ZUBER LAWLER & DEL DUCA LLP
  | 777 S. Figueroa Street, 37th Floor
6 | Los Angeles, California 90017  USA
  | Telephone:  +1 (213) 596-5620
7 | Facsimile:    +1 (213) 596-5621

8 | Attorneys for Plaintiff, Rumble, Inc.

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA, WESTERN DIVISION

| RUMBLE, INC., | Case No. |
|---|---|
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) COPYRIGHT INFRINGEMENT;** |
| THE DAILY MAIL AND GENERAL TRUST PLC dba THE DAILY MAIL, DMG MEDIA LTD dba DAILYMAIL.COM and MAILONLINE, and DOES 1-10, inclusive, | **(2) UNFAIR COMPETITION UNDER CAL. BUS. & PROF. CODE §§ 17200 *ET SEQ.*** |
| Defendants. | **DEMAND FOR JURY TRIAL** |

1

## INTRODUCTION

This dispute arises from the willful infringement by the Defendants of copyrighted videos as to which plaintiff Rumble, Inc. is the exclusive licensee (with the right to bring actions for infringement).

Rumble is one of the most successful and respected companies in the business of obtaining the licensing and enforcement rights from the owners/authors of online-video content (such as the lovable animal videos that helped to launch and popularize YouTube; e.g., "The Cutest Cats Around" and other attention-grabbing videos), and in turn licensing those videos to other companies who have websites or other social media sites, and who want to make those videos available to visitors to their sites in order to generate advertising revenue. Many of those companies in turn license the Rumble videos to others, thereby generating additional revenue.

The original author (the "content-creator") of the video should be compensated for the publication of his or her video. More often than not in the past, however, he or she was not. This is where Rumble comes into the picture.

Rumble provides an important service to the untold number of "little guy/gal" videographers who create the video content that is uploaded to the internet, enjoyed by millions, and monetized by a few. By themselves, these individual content-creators cannot effectively police and enforce their copyrights against those infringers who use their videos without approval, authorization or paying anything. These serial infringers can and do make very large sums of money using these copyright-protected videos without ever paying one penny to the content-creator. These serial infringers can most often willfully infringe with impunity, relying on the practical inability of the vast majority of the content-creators to enforce their copyrights.

Rumble provides a platform for those individual content-creators to monetize their copyrighted videos. By simply appointing Rumble as their exclusive licensee as to their copyrighted video(s), and then uploading their video(s) to Rumble's

platform, Rumble takes over and does all the rest. Rumble makes its portfolio of exclusively-licensed videos available to others to use for a fee (and a portion of the downstream revenue collected by the user), monitors that use, collects the fee (and revenue), and shares it with the content-creator. There are some individual content-creators who are receiving royalties in the 6-figures annually, and many that are receiving annual 5-figure royalties.

Currently, Rumble has over 300,000 videos in its portfolio, and more are being added at the rate of about 1200 each day. Rumble has licensed, and is currently licensing, its videos to some of the largest and most well-known companies and websites in the world.

At one time, Rumble had also licensed its videos to Defendants. Even though that license terminated such that Defendants had _no_ further rights to use any of Rumble's copyrighted videos, Defendants continued to do so through at least the MailOnline website, and also on Defendants' Facebook and Instagram accounts.

At first, Rumble assumed this was mere inadvertent holdover use, with certain individuals within the relevant Defendant entities simply unaware that the license had terminated. So, Rumble advised the persons with whom Rumble had been dealing within Defendants' organization of the continued (now unauthorized) use of its videos, that Defendants were no longer licensed, and requesting that the infringement stop. Rumble fully expected Defendants to immediately stop, and if not immediately, promptly. They did neither.

As the infringing use continued and continued, Rumble eventually felt it had no choice but to retain counsel to up the ante, and bring the issue to Defendants' legal counsel. Counsel for Rumble and for Defendants did become involved, and Defendants' counsel was advised of the infringement and the request that the infringement stop.

Once counsel for Defendants became involved, Rumble believed surely then the infringement would stop – surely once advised by their counsel that they were

3

committing copyright infringement and warned of the consequences, they would stop. That did not happen.

Amazingly, the copyright infringement by Defendants continued. Rumble, of course, does not know for sure if Defendants' counsel actually told them to stop, and if so how many times Defendants' counsel told them to stop infringing. But, Rumble reasonably believes that Defendants were told by their counsel to stop infringing.

Rumble certainly knows that Defendants were told multiple times to stop infringing – by Rumble itself and by Rumble's counsel for sure, and, as mentioned, Rumble also believes that Defendants were told to stop by their own counsel. All to no avail, as the infringement by Defendants continues.

Therefore, Rumble asserts that the infringement here is of the most bold and bald-faced kind, exhibiting an utter disrespect for the copyrights of others. That it is "willful" in the factual and legal sense of the word is beyond dispute, such that the ultimate damages to be awarded will be reasonably and justifiably enhanced, including an award of Rumble's attorneys fees as well.

It is anticipated that Defendants, like most serial infringers, will plead and seek to hide behind claims of "innocence" in the form of "we didn't know," or "we thought we were licensed," or "the right hand didn't know what the left hand was doing" or " we were just negligent and careless, but not willful," or some such other well-worn, baseless excuse that are typically trotted out by willful infringers.

Rumbles believes, however, that the evidence at trial will show that rather than such excuses being valid here, Defendants' conduct – turning a blind eye to the copyrights of others, and infringing copyrights owned by others – appears to be part of Defendants' playbook. Defendants' continuing to infringe, even after (as Rumble suspects) their own counsel told them to stop, confirms for Rumble that the willfulness of the infringement here is beyond peradventure.

///

1       Significantly, at no time since the infringement was brought to Defendants'
2 attention well over a year ago have Defendants asserted that there was no
3 infringement of a large number of Rumble videos ('the Infringed Videos"), or
4 asserted that the Infringed Videos were not copyright protected.  Therefore,
5 Defendants had and have no excuse whatsoever for infringing at all, let alone after
6 being advised to stop, and certainly not for their continuing to infringe.

7       The resultant damages to Rumble and its licensor content-creators as the
8 result of the infringement and other wrongful conduct by Defendants is enormous.
9 It is believed that Defendants have not only collected and are continuing to collect
10 advertising revenue from their unauthorized use of the Infringed Videos, but have
11 very actively and profitably re-licensed the infringed Rumble videos to others.
12 Because the Infringed Videos are among the most popular in Rumble's portfolio,
13 Rumble believes that the advertising and licensing revenue and profits obtained by
14 Defendants through their infringing conduct could average $50,000 per video, or
15 more.  That, of course, would have resulted in substantial royalties to Rumble, from
16 which it would have passed a significant portion onto the content-creators.

17       Prior to filing this lawsuit, Rumble sought in good faith to resolve the matter
18 amicably with Defendants, and sought information as to the revenue that Defendants
19 had received on the Infringed Videos such that a reasonable settlement could be
20 reached that would provide to both Rumble and the content-creators of the Infringed
21 Videos a fair compensation for the willful infringement by Defendants.  Those
22 efforts proved unsuccessful.  Indeed, infringement by Defendants has continued
23 even after an initial draft of this Complaint was sent to Defendants' counsel, and
24 efforts at reaching an amicable resolution were undertaken.  Therefore, it appears
25 that Defendants will not provide relevant information or stop infringing until they
26 are ordered by the Court to do so.  That is why this case is being filed now.

27       While the total damages and fees that will eventually be sought at trial is still
28 unknown with precision, at this point Rumble believes that amount could approach

or even exceed $10,000,000. Rumble will also seek preliminary and permanent injunctive relief against Defendants as to any future infringements.

In light of the foregoing, for its Complaint herein against Defendants, Rumble alleges as follows:

## THE PARTIES

1. Plaintiff Rumble, Inc. ("Rumble") is a Canadian corporation, with its principal place of business at 218 Adelaide Street West, Suite 400, Toronto, Ontario, M5H1W7.

2. Defendant Daily Mail and General Trust PLC ("DMGT") is believed to be a United Kingdom public limited company having its principal place of business at Northcliffe House, 2 Derry Street, Kensington, London Borough of Kensington and Chelsea, London, United Kingdom. Rumble is informed and believes that DMGT is a multi-faceted company that owns, has invested in, and/or manages a multi-national portfolio of businesses, including directly or through other entities, the other named Defendants. It is believed that DMGT itself, and certainly through its vast holdings and control, does business on a daily business in California and within this judicial district. Therefore, this court has personal jurisdiction over DMGT.

3. Defendant The Daily Mail (TDM) is a company owned and controlled by DMGT. Rumble does not currently have sufficient information or belief as to whether TDM is a separate legal entity in its own right, or a "dba," division, or subsidiary of DMGT. It is believed that TDM's principal place of business is publicly listed to be the same, and is the same, as that for DMGT. It is believed that TDM publishes or is in control of publishing, distributing and selling tabloid-type newspapers in both hard copy and online throughout the world, including in California and this judicial district. It is believed that TDM itself and through its affiliates and agents do business on a daily business in California and within this judicial district. Therefore, this Court has personal jurisdiction over DMGT.

6

4. Defendant DMG Media (DMGMedia), formerly known as Associated Newspapers, is believed to be a division or wholly-owned subsidiary of defendant DMGT, and to have the same principal place of business as DMGT. It is believed that DMGMedia is a multi-channel consumer media company that owns and controls both paper and electronic media, including websites such as DAILYMAIL.COM, which is available online at www.dailymail.co.ik/UShome/index.html ("DMWebsite").

5. The DMWebsite is specifically targeted to consumers in the United States generally, including to consumers in California and this judicial district. For example, attached as Exhibit A is a 25-page color printout from the DMWebsite on January 15, 2017. One of the drop-down tabs is "U.S. Showbiz." The lead articles on the first few pages deal mainly with then President-elect Trump, his upcoming inauguration and other Trump-related articles. For just one of many possible examples of articles specifically targeted to consumers in this judicial district, on page 9 of Exhibit A, there is an article entitled: "Green Vegetation, overflowing rivers and a deep snowpack: Stunning image from Space shows California's drought is truly over after record rainfall."

6. Defendant DMGMedia is also believed to own and control a smartphone "app" called "MailOnline." Rumble does not yet know if MailOnline is a separate entity, a dba, or a division of DMGMedia. The MailOnline App is available in California and this judicial district from Apple iTunes. *See* https://itunes.apple.com/us/app/mailonline/id384101264?mt=8. It is believed that DMGMedia does business on a daily basis in California and within this judicial district. Therefore, this Court has personal jurisdiction over DMGMedia, and if MailOnline is a separate legal entity, over MailOnline as well.

7. Rumble is ignorant of the inter-relationships and inter-workings of defendants DMGT and DMGMedia, and whether there are any other legal entities in the chain of title, command and control with respect to the wrongful actions

hereinafter alleged, and therefore reserves the right to add or delete entities as defendants herein as that information is provided, either voluntarily or through discovery. In that regard, Rumble invites the currently-named Defendants to advise Rumble if the Defendants now named are over- or under-inclusive, and if so, why and who should be added or deleted so as to expedite the process of having the appropriate entities named as defendants. In addition to other individuals and entities within the DMGT portfolio of companies who should be named defendants, there may be other individuals and entities outside the DMGT corporate web who have some involvement and liability for the wrongful acts herein alleged, including perhaps conspiring with other Defendants. Therefore, as their true names or capacities are at this time unknown to Rumble, they are sued herein under the fictitious names Does 1 through 10, inclusive. Rumble reserve the right to amend this Complaint as appropriate, including the right to assert other claims for relief, for example, for Conspiracy, should discovery in this matter disclose that a conspiracy to infringe existed by and among one or more defendants, and/or with any third party.

## **JURISDICTION AND VENUE**

8. This action arises under the copyright laws of the United States, 17 U.S.C. §§ 501, *et seq.,* This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331, 1338(a) and 1400(a). This Court has jurisdiction of the related asserted claim under 28 U.S.C. §§ 1338(b) and 1367.

9. Venue is proper in this district under 28 U.S.C. §§ 1391(b)–(d) and 1400(b). Defendants have committed unlawful acts in this judicial district. Defendants and each of them have done business in this venue or may be found in this judicial district. Venue is also proper in the Central District of California pursuant to 28 U.S.C. §1391(c) in that the Defendants have substantial business contacts with the Central District of California as Defendants (or their agents) have been infringing copyrighted videos of Rumble in the Los Angeles area, and throughout the United States and abroad.

## FACTS COMMON TO ALL CLAIMS

10. Rumble operates an open video platform that sources, validates, provides clearance management, distribution and monetization for video content. It is a content-creator-centric platform, whose main goal and core business model has always been to help video creators increase distribution and monetize their videos. Rumble allows video creators to host, share, monetize and distribute their video content from one centralized account.

11. Rumble has proprietary software that is believed to be among the most sophisticated in the industry to identify and validate the actual content-creator for the videos in its portfolio. This allows Rumble to verify, to a high degree of confidence, that the content-creators are in fact the copyright holder as to the videos uploaded onto its platform.

12. Rumble has working relationships with some of the most respected video creators and licenses video content through its revenue-share video player and, if licenses permit, through other video players to many very well-known websites, including those that are household names.

13. Rumble's website, Rumble.com, is where video creators can host, share, create channels, monetize, and distribute their content across the Internet and television from a single centralized video platform. For publishers, newsrooms and brands, Rumble helps to identify, source, validate and acquire licenses to the most important and popular social videos on the web.

14. Currently, Rumble has more than 55,000 amateur and professional video content-creators that currently contribute to more than 500,000,000 streams per month. Some of the top video content-creators use Rumble's platform. Rumble's creator-centric platform has enabled more of these amateur and professional video content-creators, media companies, and celebrities to distribute and monetize their social videos more than ever before.

///

15. Content-creators upload their videos to Rumble.com, and Rumble makes these videos available to websites for monetization. Videos can also be distributed to over 400 partner sites including high-traffic, household-name outlets.

16. Rumble has experienced remarkable growth since 2014, and has entered into the Top 100 websites as ranked by Amazon's Alexa.com, and Quantcast.

17. Based on data from Google Analytics in May 2017, in the United States alone Rumble's platform generated over 62 million users, and globally, Rumble reached over 100 million users. In short, Rumble is a one of the most respected and successful video content monetization platforms in the world.

18. On September 1, 2014, Rumble and Associated Newspapers Ltd. ("ANL")( now defendant DMGMedia) entered in a "Video Content, License Agreement" ("the License Agreement") whereby Associated Newspapers was to pay Rumble certain sums for the use of Rumble's videos. Pursuant to the License Agreement, ANL did in fact for a period of time use videos from Rumble's portfolio, and paid Rumble for that use. *See,* Exhibit B, which is a listing of the payments made by ANL to Rumble from August 6, 2014 through December 31, 2015 (the amounts of the payments have been redacted).

19. On April 9, 2015, a Ms. Angelica Asplund, on behalf of ANL, sent a letter to Rumble, advising that ANL was serving Notice of Termination of the License Agreement, effective as of May 9, 2015. (A true and correct copy of that letter is attached as Exhibit C). In that letter, Ms. Asplund also said: "We reserve the right to contact you in regards to licensing content on an ad hoc basis after the end of this Agreement." Thus, even in the Notice of Termination, Ms. Asplund, as authorized representative of Defendants, was acknowledging that Defendants were not free to use videos from Rumble's portfolio without first obtaining a license from Rumble.

///

20. Thereafter, when Rumble discovered that Defendants were continuing to publish videos from Rumble's portfolio without license, the founder and president of Rumble sent "cease and desist" type emails to ANL's representatives confirming to ANL that it was no longer licensed, and in the future, would not be licensed, to use any of Rumble's videos. (A true and correct copy of two such communications are attached hereto as Exhibit D, partially redacted).

21. Therefore, it is absolutely clear, and not subject to good faith dispute, that at least defendant DMGMedia (formerly known as Associated Newspapers Ltd.) knew of Rumble, and had knowledge no later than September 1, 2014 that Defendants needed a license from Rumble to use videos from Rumble's portfolio. It is also absolutely clear, and not subject to good faith dispute, that at least defendant DMGMedia (and by implication, also the other Defendants) knew that after the termination of the License Agreement on May 9, 2015, Defendants would need an "ad hoc" license if they wanted to publish or otherwise use videos from Rumble's portfolio. It is also absolutely clear, and not subject to good faith dispute, that at least defendant DMGMedia (and by implication, also the other Defendants) knew that after receipt of the communications attached as Exhibit D, that such *ad hoc* licenses, indeed licenses of any nature, would not be available to it. In other words, at that point DMGMedia (and by implication, also the other Defendants) knew that it could not freely use or sublicense Rumble's videos without Rumble's consent. In yet other words, DMGMedia (and by implication, also the other Defendants) knew that doing so would be copyright infringement. In yet other words, DMGMedia – a company with employees who know that Rumble's videos are copyright protected -- knew that doing so would be willful infringement. On information and belief, this knowledge by defendant DMGMedia is also imputed to defendant DMGT.

22. It was DMGMedia who terminated the License Agreement, and the termination was not based upon any act or failure to act by Rumble.

///

23. According to some published reports, willfully infringing copyrights is part of DMGMedia's playbook, or standard operating procedure. *See*, *e.g.,* the articles published at https://digiday.com/media/video-content-mail-online-break-com/ and http://www.hollywoodreporter.com/thr-esq/gawker-agrees-alter-story-dailymailcom-settlement-mail-online-951352, The first article, published November 11, 2013, is entitled "Need More Video Content? Try Stealing Some", and goes on to state:

> "When you watch a video on the Mail Online's website, served in the Mail Online's video player, after pre-roll ads sold by the Mail Online's sales team, you'd be forgiven for thinking the company had the right to monetize that content. You might be wrong.
>
> "Video owners say the publisher is taking their content without permission, dropping it in its proprietary player, and then selling ads against it to major advertisers such as Doritos."

The latter article includes the following statement:

> "King, a former freelancer for Mail Online, penned a piece about lifting other publications' stories wholesale, writing that 'the Mail's editorial model depends on little more than dishonesty, theft of copyrighted material, and sensationalism so absurd that it crosses into fabrication.'"
> (Emphasis added).

The manner in which Defendants have willfully infringed (and are believed to have "licensed" others to infringe) Rumble's copyrighted videos lends credence to these reports. Certainly, given the conduct by Defendants as discussed above, Rumble has formed the opinion that willfully infringing videos is indeed part of Defendants' playbook.

12

24. Rumble has registered copyrights and filed applications to register copyrights on the videos listed in Exhibit E hereto and incorporated by reference, which Rumble asserts have been infringed by Defendants. Within the Ninth Circuit and this judicial district, a claim for copyright infringement can be made after the application to register is filed, but before the registration is received. Therefore, Rumble will seek leave of Court to amend this Complaint to add the additional Registration Numbers when issued.

25. In all, Rumble believes that there are well in excess of 50 copyrighted Rumble videos willfully infringed by Defendants (hereinafter referred to as "the Infringed Videos"). Rumble also believes that some of the Infringed Videos were published by Defendants more than once without authorization on different platforms, and thus each additional publication may also be a separate act of willful infringement (as the circumstances here are materially different than in the case law that generally states that multiple identical copies of an infringing work by the same infringer (for example, of a book or record) may not each be a separate act of infringement). In addition, for those of the Infringed Videos that were at one time "licensed" to Defendants under the License Agreement, re-publishing of those videos by Defendants after the termination of the License Agreement was another separate act of willful infringement.

26. Therefore, Rumble is informed and believes that there has already been well more than 50 instances of infringement by Defendants, which infringement Rumble believes was willful. Rumble has also confirmed that infringement by Defendants is continuing, such that the total number of infringements to be asserted at trial is at this time unknown. The continuing infringement further confirms that the entirety of Defendants' infringement has been willful. A complete analysis of the infringing uses by Defendants and a complete listing of the Infringed Videos up to trial will be presented at trial.

///

## FIRST CLAIM FOR RELIEF

### Infringement of Copyrights under 17 U.S.C. §§ 501 *et seq.*

27. Rumble incorporates the allegations of the foregoing paragraphs as though fully set forth here.

28. One of more of Defendants have infringed, and/or has contributed to the infringement, of Rumble's copyrighted videos, which infringement of the Infringed Videos is imputed to the other Defendants.

29. For their own profit and advantage, Defendants are misappropriating the non-transformed, copyrighted materials in which Rumble has invested heavily, both in hard dollar and sweat equity investments, to create the content-centric platform that allows the content-creators to easily and effectively monetize their copyrighted works. Defendants have, without authorization from Rumble or the individual content-creators, used and published these copyrighted videos, which constitutes copyright infringement.

30. Rumble has complied in all respects with 17 U.S.C. §§ 101 et seq., and secured, or is in the process of securing, the exclusive rights and privileges to sue and collect damages for infringement of the copyrights of the above-referenced videos. Rumble has been and still is the sole entity with right to bring suit for infringement of the copyrights in the Infringed Videos.

31. For each of the Infringed Videos (as set forth on Exhibit E) for which infringement is claimed herein, Rumble has obtained a Rumble Content Agreement (which includes an exclusive license) from the content-creator for the video. A copy of one such representative Agreement and License is attached as Exhibit F (partially redacted). Each Agreement states (in part): "You are granting Rumble an exclusive, worldwide, commercial, sub-licensable and transferable license to use, reproduce, distribute, edit, syndicate, prepare derivative works of, display, and perform the Content in connection with the Services … in any media formats and through any media channels. … You hereby irrevocably appoint Rumble Inc. as

your attorney-in-fact to take any such action as may from time to time be necessary to effect, transfer, or assign the rights granted to Rumble herein, including without limitation copyright-related actions, and you hereby assign to Rumble to right to prosecute any and all claims from the past, present, and future used of the Videos by unauthorized third parties." Each Agreement also confirms that the content-creator "[has] not signed an exclusive agreement with any other parties," confirming that Rumble is the sole and exclusive licensee as to the Infringed Videos. Thus, Rumble has standing to bring this action for infringement of the Infringed Videos. *See*, Minden Pictures, Inc. v. John Wiley & Sons, Inc., 795 F.3d 997, 1005-06 (9th Cir. 2015)("Because we conclude that the Agency Agreements convey the rights to reproduce, distribute, and display the photographs to Minden via an 'exclusive license' to grant licenses to third parties, we hold that Minden may bring an infringement action to remedy the unauthorized reproduction, distribution, and display of the photographs by those to whom it has granted licenses."). As in Minden, Defendants had previously been licensed by Rumble to publish videos within Rumble's portfolio, and now Rumble is suing Defendants because they continued to publish videos from Rumble's portfolio, but without authorization or license to do so, without paying anything to either Rumble or the content-creator, and is now infringing the copyrights in those videos. Defendants are now estopped to assert that Rumble does not have standing to sue for that infringement.

32. Defendants' conduct violates the exclusive rights belonging to Rumble, and to the content-creators, who have exclusively licensed those rights to Rumble, who in turn, is now owner of the right to sue for and collect damages for infringement of the copyrights in the Infringed Videos, including without limitation Rumble's and content-creator's rights under 17 U.S.C. § 106.

33. On information and belief, Rumble alleges that, as a direct and proximate result of their wrongful conduct, Defendants have realized and continue to realize profits and other benefits rightfully belonging to Rumble and the content-

1 creators. Accordingly, Rumble seeks an award of damages pursuant to 17 U.S.C.
2 §§ 504 and 505.

3     34. Defendants' infringing conduct has also caused and is causing
4 substantial and irreparable injury and damage to Rumble (and its licensor content-
5 creators) in an amount not capable of determination, and, unless restrained, will
6 cause further irreparable injury, leaving Rumble with no adequate remedy at law.
7 On information and belief, Defendants have willfully engaged in, and are willfully
8 engaging in, the acts complained of with oppression, fraud, and malice, and in
9 conscious disregard of the rights of Rumble and the licensor content-creators.
10 Rumble is, therefore, entitled to at least to the maximum statutory damages
11 allowable for willful infringement, a material portion of which will be then
12 transferred to the licensor content-creators.

13     35. In addition to the damages to which Rumble is entitled due to
14 Defendants unauthorized use and infringement of the copyrighted videos, Rumble is
15 informed and believes that Defendants have also sublicensed the copyrighted videos
16 to others, and have obtained revenue from that activity. All such revenue rightfully
17 belongs to Rumble (and a portion of which belongs, through Rumble, to the content-
18 creators).

19     36. Rumble is informed and believes that Defendants have willfully
20 infringed on the copyrights owned and/or controlled by Rumble, which were
21 properly registered with the Copyright Office, or as to which the application to
22 register the copyright has been filed.

23     37. Based on the foregoing, and pursuant to 17 U.S.C. § 504, Rumble is
24 entitled to have Defendants disgorge all profits earned (directly or indirectly) as a
25 result of Defendants' copyright infringement.

26     38. In the alternative to payment of Defendants' profits, pursuant to
27 17 U.S.C. § 504, Rumble is entitled to One Hundred Fifty Thousand ($150,000)
28 Dollars per willful infringement after the date of registration of the official

copyright, which as of the date of this filing constitutes more than 50 separate and individual infringements.

39. In addition, pursuant to 17 U.S.C. § 503, Rumble respectfully requests this Honorable Court: a) to order the impounding of all copies of the Defendants' infringing videos; b) to order the Defendant to cease and desist from further distributing any video from Rumble's portfolio; and c) preliminarily to order that all revenue received in the past or in the future by Defendants on account of their infringement be paid into an interest-bearing escrow account.

40. In addition, pursuant to 17 U.S.C. § 505, Rumble respectfully requests this Honorable Court to order the Defendants to pay all costs incurred by Rumble in the prosecution of this civil action, including, but not limited to, expert witness fees, costs, and attorney's fees.

## SECOND CLAIM FOR RELIEF

**Unfair Competition under Cal. Bus. and Prof. Code §§ 17200 *et seq.***

41. Rumble incorporates by reference each and every allegation contained in the foregoing paragraph, as though fully set forth here.

42. The actions of Defendants as described above, whether individually or as agents, representatives, or employees of one another, constitute unfair competition under California Business and Professions Code §§ 17200 et seq., which has proximately caused damage to Rumble (and the content-creators), for which Rumble is entitled to compensatory damages, costs and attorneys fees.

## PRAYER FOR RELIEF

WHEREFORE, Rumble prays for judgment against Defendants, jointly and severally, as follows:

1. For compensatory damages according to proof, including actual and/or statutory damages, and collateral damage for copyright infringement, including all of the revenue and profits obtained by Defendants as a result of that infringement.

2. That such infringement was willful;

3. That Defendants and each of them, and their subsidiaries, dba's, divisions, affiliates, parents, successors, assigns, officers, agents, representatives, servants, and employees, and all persons in active concert or participation with them or any of them, be preliminarily and permanently enjoined from unlawfully using copyrighted video's as to which Rumble is the exclusive licensee;

4. That Rumble be awarded its attorneys' fees and costs under 17 U.S.C. §505 and the inherent power of the Court;

5. That Defendants be ordered to pay damages for unfair competition;

6. That Defendants be preliminarily ordered to pay all revenue received in the past or in the future by Defendants on account of their infringement into an interest-bearing escrow account; and

7. That Rumble have such other and further relief as this Court deems just and proper.

Respectfully submitted,

Dated: July 6, 2017          ZUBER, LAWLER & DEL DUCA LLP


By: /s/ Robert W. Dickerson
    Robert W. Dickerson
    Attorneys for Rumble, Inc.

**DEMAND FOR JURY TRIAL**

Rumble hereby demands trial by jury of all issues, which are so triable in this action and on this complaint.

Respectfully submitted,

Dated: July 6, 2017

ZUBER, LAWLER & DEL DUCA LLP

By: */s/ Robert W. Dickerson*
Robert W. Dickerson
Attorneys for Rumble, Inc.